No. 22-15889

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

ANDREW MATTIODA,
*Appellant*,

– v. –

WILLIAM NELSON II, in his official capacity as Administrator,
National Aeronautics and Space Administration;
and
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,
an Agency of the United States,
*Appellees*.

On Appeal from the United States District Court
For the Northern District of California
Docket No. 5:20-cv-03662-SVK

**APPELLANT'S OPENING BRIEF**

Erika A. Heath
DUCKWORTH & PETERS LLP
369 Pine Street, Suite 410
San Francisco, CA 94104
(415) 433-0333
erika@duckworthpeters.com

*Attorney for Plaintiff/Appellant*
*Andrew Mattioda*

November 21, 2022

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION ................................................ 2

ISSUES PRESENTED ..................................................................... 3

STATEMENT OF THE CASE ........................................................ 3

I. FACTUAL BACKGROUND ...................................................... 3

   a. Dr. Mattioda is an Accomplished NASA Scientist who Happens to Have a Disability ....................................................................... 3

   b. Starting in 2011, Dr. Mattioda experiences persistent harassment and ridicule on account of his need for reasonable accommodations ..................... 5

   c. Applying Stereotypes About the Productivity and Abilities of Disabled Employees, Dr. Lee and Dr. Dotson Harassed Dr. Mattioda and Refused to Support His Success ........................................................ 9

   d. Dr. Dotson's Harassment of Dr. Mattioda Escalates in 2013 ................. 14

   e. Dr. Lee Influences A Selection Committee Not to Hire Dr. Mattioda for Senior Scientist ................................................................... 16

II. PROCEDURAL HISTORY ....................................................... 20

III. STANDARD OF REVIEW ...................................................... 23

IV. LEGAL ARGUMENT .............................................................. 23

   a. The District Court Erred By Dismissing Dr. Mattioda's Harassment Claim Under Rule 12(b)(6) ...................................................... 25

     i. Dr. Mattioda Adequately Pleaded Harassment ................................ 25

     ii. The District Court Applied the Wrong Standard in Evaluating Dr. Mattioda's Complaint and Declined to View the Full Context of the Hostile Acts ...................................................... 34

b.    There Were Genuine Issues of Material Fact on Dr. Mattioda's Claim Regarding NASA's Failure to Select him for the ST Position. ......................36

i.    Dr. Mattioda Made a Prima Facie Case Through Dr. Lee's Animus and His Influence on the Decision ......................................................37

ii.    NASA Did Not Meet its Burden to Establish a Non-Discriminatory Justification for its Decision .................................................................41

iii. Genuine Issues of Material Fact Exist as to Pretext...........................41

**CONCLUSION**............................................................................................43

**STATEMENT OF RELATED CASES**.................................................44

**CERTIFICATE OF COMPLIANCE** ...................................................44

**CERTIFICATE OF SERVICE** ...........................................................45

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Accardi v. Superior Ct.*,
    17 Cal. App. 4th 341 (1993) ..................................................... 28

*Andrews v. City of Philadelphia*,
    895 F.2d 1469 (3d Cir. 1990) ........................................... 27, 35

*Arizona Students' Ass'n v. Arizona Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) ................................................... 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................. 26

*Bergene v. Salt River Project Agr. Imp. & Power Dist.*,
    272 F.3d 1136 (9th Cir. 2001) ................................................. 41

*Burns v. McGregor Elec. Indus., Inc.*,
    955 F.2d 559 (8th Cir. 1992) ................................................... 35

*Douglas v. Noelle*,
    567 F.3d 1103 (9th Cir. 2009) ................................................. 23

*Douglas v. Cal. Dep't of Youth Auth.*,
    285 F.3d 1226 (9th Cir.2002) .................................................. 24

*Flowers v. S. Reg'l Physician Servs. Inc.*,
    247 F.3d 229 (5th Cir. 2001) ....................................... 24, 27, 28

*France v. Johnson*,
    795 F.3d 1170 (9th Cir. 2015) ................................................. 39

*Gillette v. Stater Bros. Markets*,
    2019 WL 8017735 (C.D. Cal. Sept. 23, 2019) ........................ 26

*Gollah v. City of Millersburg*,
    2018 WL 6183268 (D. Or. Nov. 27, 2018) ............................. 26

iv

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993)..................................................................... 25

*Haysman v. Food Lion, Inc.*,
    893 F. Supp. 1092 (S.D. Ga. 1995) ................................... 30, 31

*Heldt v. Tata Consultancy Servs., Ltd.*,
    132 F. Supp. 3d 1185 (N.D. Cal. 2015).................................... 26

*Hittle v. City of Stockton*,
    2018 WL 1367451 (E.D. Cal. Mar. 16, 2018)......................... 26

*Leiken v. Squaw Valley Ski Corp.*,
    1994 WL 494298 (E.D. Cal. June 28, 1994) .......................... 31

*Lopez-Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014) ................................................... 23

*Maduka v. Sunrise Hosp.*,
    375 F.3d 909 (9th Cir. 2004) ................................................... 25

*Mayes v. WinCo Holdings, Inc.*,
    846 F.3d 1274 (9th Cir. 2017) ................................................. 41

*McCann v. City of Eugene ex rel. Fire & EMS Dep't*,
    833 F. Supp. 2d 1250 (D. Or. 2011) ....................................... 31

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................................. 31

*Ray v. Henderson*,
    217 F.3d 1234 (9th Cir. 2000) ........................................... 28, 29

*Reinhardt v. Burlington N. Santa Fe R.R.*,
    846 F. Supp. 2d 1108 (D. Mont. 2012) ................................... 31

*Reynolds v. Brock*,
    815 F.2d 571 (9th Cir. 1987) ................................................... 37

*Sanders v. Kerry*,
    180 F. Supp. 3d 35 (D.D.C. 2016) ............................................................ 24

*Shager v. Upjohn Co.*,
    913 F.2d 398 (7th Cir. 1990) ................................................................... 39

*Sheppard v. David Evans & Assoc.*,
    694 F.3d 1045 (9th Cir. 2012) ................................................................. 26

*Silvas v. E\*Trade Mortg. Corp.*,
    514 F.3d 1001 (9th Cir.2008) ................................................................. 23

*Snead v. Metro. Prop. & Cas. Ins. Co.*,
    237 F.3d 1080 (9th Cir. 2001) ........................................................... 36, 37

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................. 25

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002) ..................................................................... passim

*Walton v. U.S. Marshals Serv.*,
    492 F.3d 998 (9th Cir. 2007) ................................................................... 37

*Williams v. Modly*,
    796 F. App'x 378 (9th Cir. 2020) ............................................................ 24

*Woodman v. Runyon*,
    132 F.3d 1330 (10th Cir. 1997) .............................................................. 24

*Wong v. United States*,
    373 F.3d 952 (9th Cir. 2004) ................................................................... 26

*Yonemoto v. McDonald*,
    114 F. Supp. 3d 1067 (D. Haw. 2015) .................................................... 27

*Zetwick v. Cnty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017) ........................................................... 27, 35

## Statutes and Rules

Fed. R. App. P. 3 .................................................................2

Fed. R. App. P. 4(a)(1)(B) ...................................................3

Fed. R. Civ. P. 8(a)(2)........................................................ 27

28 U.S.C. § 1291 .................................................................2

28 U.S.C. § 1331 .................................................................2

29 U.S.C. § 701(b) ........................................................ 23, 31

29 U.S.C. § 791(b) ........................................................ 24, 40

29 U.S.C. § 791(f)......................................................... 24, 37

29 C.F.R. § 1614.203(b) ................................................ 23, 24

42 C.F.R. § 12112 ............................................................. 37

## **INTRODUCTION**

Dr. Andrew Mattioda is an esteemed scientist with the National Aeronautics and Space Administration ("NASA"). He also happens to have a number of physical disabilities.

By the time his supervisors at NASA were aware of his disabilities, and his need for reasonable accommodations, they began a years-long campaign of mocking him and harassing him about his need for accommodations. To make matters worse, one of his supervisors (Dr. Timothy Lee) persistently imposed stereotypes of inability on him as a scientist and employee, suggesting he was lazy or used his disability to avoid work. Notably, those characterizations by his supervisor could not have been based in fact for such a high performing scientist. After Dr. Mattioda had enough of this treatment and had the audacity to complain about it, he became labeled a "troublemaker" and faced further ridicule.

Unfortunately, the district court found that such facts did not amount to a claim of harassment, and it dismissed that claim under Rule 12(b)(6). In so doing, the court imposed an unduly burdensome pleading standard and refused to look at all of the harassment as a whole – as this Court has long instructed should be done in cases of harassment. As a result, the trial court erred by dismissing the harassment claim at the beginning stages of litigation.

1

The district court also erred by later granting summary judgment in favor of Defendants on a remaining discrimination claim related to the selection process of a senior scientist position. In that selection process, Dr. Lee calculated scores (called *h*-index scores) for each of the three top candidates, showing Dr. Mattioda's score as the lowest, and then almost simultaneously recused himself from the process given Dr. Mattioda's complaints of harassment against him. Based largely on the *h*-index scores provided by the recused Dr. Lee, the panel then unsurprisingly selected another candidate over Dr. Mattioda. The district court erred in its summary judgment analysis by failing to properly consider the many facts supporting Dr. Lee's discriminatory intent, as well as the discriminatory nature of the *h*-index scores in this particular context.

This Court should reverse those two errors from below, and permit Dr. Mattioda's harassment claim to move into discovery, and his discrimination claim related to the selection process to move to a jury.

## STATEMENT OF JURISDICTION

The District Court had original jurisdiction under 28 U.S.C. § 1331, as this action arises under the laws of United States, specifically, Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq*.

The trial court issued a final judgment in favor of all defendants, giving this Court jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 3. The judgment

was entered on May 3, 2022, (1-ER-2-10,) and the Notice of Appeal was timely filed pursuant to Fed. R. App. P. 4(a)(1)(B) on June 13, 2022 (2-ER-80-82.)

## ISSUES PRESENTED

I.      Whether a district court errs by dismissing a harassment claim under section 501 of the Rehabilitation Act by failing to consider the totality of the facts surrounding the harassment.

II.     Whether a district errs by granting summary judgment on a discrimination claim when there are issues of fact concerning the discriminatory influence of a person who recused himself from the hiring process.

## STATEMENT OF THE CASE

### I.      FACTUAL BACKGROUND

#### a. Dr. Mattioda is an Accomplished NASA Scientist who Happens to Have a Disability

Dr. Mattioda began working for NASA as a Post-Doctoral Student in 2000. In 2004, the NASA Ames Research Center ("AMES") began using his expertise as a contractor.  In August 2007, AMES then hired Dr. Mattioda as a Space and Planetary Scientist with the Astrophysics Branch, under the Space Sciences and Astrobiology Division ("SS") of the Science Directorate ("S"), at its location in Moffett Field, California.  In June 2016, Dr. Mattioda was transferred to his current position with the Planetary Science Systems Branch ("SST") to create a "safe

3

space" for him due to the harassment of one of his supervisors. (3-ER-381, -401-402.)

Dr. Mattioda has a long history of disabling conditions. In or around 1984, Dr. Mattioda was diagnosed with Scheuermann's disease of the spine, which causes the vertebrae to grow unevenly and ultimately causes scoliosis of the spine. He began seeing Dr. Steven Osborn, an orthopedist, in around 2002, who recommended he perform daily stretching, avoid prolonged sitting, change positions frequently, conduct regular physical therapy, consistently use ice therapy, and exercise regularly, in order to assist with his conditions. In 2007, the same year he began working in his current role at AMES, Dr. Mattioda was diagnosed with Femoral Acetabular Impingement ("FAI"), a degenerative defect disability in the hips which leads to arthritis and loss of hip function. Dr. Osborn has written several reasonable accommodation letters for Dr. Mattioda regarding travel accommodations to reduce aggravation of his conditions, specifically recommending that he purchase a premium class airline ticket to travel for flights longer than one hour in duration. (3-ER-381-382.)

Over the years, these conditions have led Dr. Mattioda to undergo multiple orthopedic treatments and surgeries. He underwent hip surgery on his right hip in 2009, and continues to face FAI issues with his left hip. In 2010, in between hip

surgeries, he underwent surgery to repair a torn labrum in his right shoulder. Dr. Mattioda has also suffered from ongoing on life-long ear infections. (*Id*.)

### b. Starting in 2011, Dr. Mattioda experiences persistent harassment and ridicule on account of his need for reasonable accommodations

By 2011, AMES was aware of Dr. Mattioda's disabilities, various surgeries, and his orthopedic limitations. (3-ER-381.) From March 2011 to around August 2011, whenever Dr. Mattioda requested assistance from the SS Division, Dr. Timothy Lee denied the requests, often making derogatory comments towards Dr. Mattioda. (3-ER-383.)

For example, on or about March 1, 2011, prior to the start of a meeting discussing an upcoming workshop in the Netherlands, Dr. Mattioda informed Dr. Lee about the recommendations from Dr. Osborn and his physical therapist that he not engage in travel, because of its orthopedic effects, unless he was able to do so with premium class accommodations. His doctor noted that a business class ticket would provide Dr. Mattioda more leg room and the ability to move around during flight, thus limiting the effects on his disabling conditions. Initially, Dr. Lee agreed to the accommodation request and asked Dr. Mattioda to determine the costs. (3-ER-388.)

After Dr. Mattioda privately disclosed the costs to Dr. Lee, however, his tone changed. Instead of being accommodating, Dr. Lee openly (and in front of

many other individuals) began harassing Dr. Mattioda about his disability. He first compared Dr. Mattioda's condition to his own hip issues, asked Dr. Mattioda more details about his hip issues, and opined, "I don't know why you can't just tough it out or suck it up and travel coach to the meeting." Needless to say, Dr. Mattioda's private health conditions were not the concern of the other individuals present at the meeting, and Dr. Lee's denigrating comments left him upset and embarrassed. (*Id*.) Ultimately, Dr. Mattioda's reasonable accommodations request for travel was denied. (3-ER-382-383.)[1]

During that same time frame, Dr. Mattioda began to feel pressure from others at AMES about his disability. On August 4, 2011, while Dr. Lee's harassment of Dr. Mattioda was intensifying, Dr. Mattioda was invited to travel to NASA Headquarters to serve on the Cassini Data Analysis Program (CDAP) proposal panel review. When Dr. Mattioda inquired with his supervisor, Dr. Jessie Dotson, about reasonable accommodations for the travel, Dr. Dotson indicated that she could support his travel but only if he used his own grant money to pay for the accommodation. Dr. Mattioda was ultimately able to attend the CDAP proposed panel review, but only after obtaining accommodation funding from the NASA

---

[1] Dr. Mattioda does not contest the trial court's order finding that the denial of that request was a discrete act that is time-barred and not subject to the continuing violation theory. (*See* 1-ER-74.) The denial itself is provided in this factual background simply for fuller context of the harassment he faced during his time at AMES.

Headquarters' official in charge of the panel review – not his own supervisor. (3-ER-385-386.)

Even though Dr. Mattioda was able to arrange his travel to the CDAP proposed panel review, however, that was not the end of the matter. The following month, Dr. Dotson admonished Dr. Mattioda for his reasonable accommodations request, threatening that if he continued to make reasonable accommodations requests, he could "lose [his] job" because of the requests. Finally, Dr. Dotson explained that even though his requests will cause an "undue hardship" on the government, she would approve them if he used his own grant money to pay for the upgraded travel. (3-ER-386.)

In the summer of 2014, Dr. Mattioda requested as reasonable accommodation to use Southwest Airlines (instead of NASA's contract carrier) for his airplane flight to a STEM Camp in Oklahoma. Although Dr. Dotson eventually approved the request, she only did so after considerable delay and resistance, as was consistently done with Dr. Mattioda's requests. (3-ER-390.)

The hostility towards Dr. Mattioda's reasonable accommodations requests was not limited to travel arrangements. For example, in September 2011, Dr. Mattioda submitted a simple request for an ergonomic chair for his office. On January 12, 2012 – after AMES officials delayed their response for months –Dr. Mattioda followed up on his request. In response, Dr. Dotson indicated that he

would need to spend his own research funds to help partially pay for the ergonomic chair. In her email response, she specifically complained, "I have not been able to find any magic pots of $ that have been set aside for reasonable accommodation requests of this nature." Dr. Mattioda felt Dr. Dotson's e-mail was intended to ridicule and harass him because of his disability. (3-ER-386-387.)

By contrast, non-disabled employees who requested ergonomic working environments did not face sarcastic remarks about needing "magic pots of $." In September 2014, a colleague, Dr. Amanda Cook received a brand-new electric sit/stand desk from Dr. Dotson. Even though she was able to obtain the desk simply upon request, when Dr. Mattioda inquired about such a desk, Dr. Dotson would only provide him one with a reasonable accommodations request. (3-ER-391.)

Even after NASA later implemented a more streamlined policy regarding reasonable accommodation travel requests, Dr. Dotson continued to belittle Dr. Mattioda regarding his own requests. On May 6, 2016, Dr. Dotson granted a travel accommodation request, but then added the requirement that Dr. Mattioda provide written or email concurrence from the manager of the travel funds, and (2) provide that concurrence to the SSA branch chief and assistant branch chief. Through Dr. Dotson's requirements, she made Dr. Mattioda the first person in NASA history to pay for this reasonable accommodation travel request through his own project

funding, as well as the first person required to obtain permission from the Principal Investigator to utilize travel funds already budgeted to him within a research grant. Dr. Mattioda found these extra demands harassing, demeaning, humiliating, and infuriating. (3-ER-398.)

### c. Applying Stereotypes About the Productivity and Abilities of Disabled Employees, Dr. Lee and Dr. Dotson Harassed Dr. Mattioda and Refused to Support His Success

Even though Dr. Mattioda is indisputably a highly accomplished NASA scientist, Dr. Lee persistently applied stereotypes regarding the abilities of disabled people to him. Dr. Lee even confirmed to another scientist, Dr. Lou Allamandola, his misguided beliefs that Dr. Mattioda was lazy and was using his medical and disability issues to avoid work. (3-ER-391-392.)

In August 2011, Dr. Mattioda learned that Dr. Lee was blocking his promotion to a GS-15 position. According to Dr. Dotson, Dr. Lee did not want to put his application for a promotion forward because "there were several other highly qualified candidates" and he did not think Dr. Mattioda's application "would make it." The decision by Dr. Lee was all the more frustrating, given Dr. Dotson's earlier comment that a candidate had to be offered several times before securing a promotion. Dr. Mattioda was offended and upset about Dr. Lee's decision to deny his promotion application, while granting applications to others who had not reported disabilities or asked for accommodations. (3-ER-383.)

9

On August 10, 2011, Dr. Mattioda asked Dr. Lee why he refused to forward his promotion application onwards, to which Dr. Lee offered several nonsensical reasons. First, Dr. Lee indicated that Dr. Mattioda's service as a Deputy Branch Chief for Code SSA did not count positively towards a GS-15 promotion, contrary to what Dr. Mattioda had previously been informed by Dr. Michael Bicay, Chief of the Science Directorate and Dr. Lee's direct supervisor.[2] Second, Dr. Lee insisted Dr. Mattioda needed to provide more lectures at conferences and publish more research – all items that increase a scientist's "*h*-index," a score which measures the number of published research articles and is more typically valued in academic circles and not applicable in government service. Dr. Lee also suggested Dr. Mattioda use personal vacation time to draft and publish research publications to improve his chances for promotion, even though it is improper for officials to request that civil servants perform work on their vacation days (i.e., "free work" for the government). It was also an example of how Dr. Lee treated Dr. Mattioda differently after learning of his disability and receiving his March 2011 accommodations request. (3-ER-383-384.) At the meeting, when Dr. Mattioda suggested it sounded like Dr. Lee did not respect him or his work, Dr. Lee flatly responded, "I don't." Dr. Lee elaborated that "[w]e all know Lou [Dr.

---

[2] Dr. Mattioda subsequently resigned his Deputy Branch Chief role because of Dr. Lee's comments. (3-ER-384.)

10

Allamandola] is doing all the work for you," implying that Dr. Mattioda was less productive than other researchers because of his disability. (3-ER-384.)

During an October 2011 conference, Dr. Allamandola insisted on photographing Dr. Mattioda giving the presentation, in order to convince Dr. Lee that Dr. Mattioda was in fact working on the project. Again, such a photograph would not have been unnecessary if Dr. Lee was not operating under the presumption that Dr. Mattioda was less productive than other scientists on account of his disability. (3-ER-387.) In fact, as described above, Dr. Lee expressed to Dr. Allamandola how he thought Dr. Mattioda was lazy and was using his medical and disability issues to avoid work. (3-ER-391-392.) In line with those beliefs, during an October 31, 2011 meeting with other scientists, Dr. Lee was openly critical and harassing about him stepping down from the Deputy Branch Chief position, when Dr. Lee's own statements about the position not counting towards promotion or career advancement are what persuaded Dr. Mattioda to step down. (3-ER-387.)

In December 2011, Dr. Mattioda learned that his highly qualified NASA Postdoctoral Program ("NPP") candidate[3] was rejected by the selection committee headed by Dr. Lee. Dr. Lee's committee based that rejection on the application of

---

[3] NPP candidates support work on a scientist's research, increase the published work from each project, and increase the quantity of hours a scientist may work on a particular project or proposal. This support increases the number of publications and the scientist's *h*-index score.

a rule (no longer in place) against hiring foreign nationals. That rationale was apparently false, however, because Dr. Lee's committee subsequently selected a lower ranked foreign national NPP candidate for someone else in February 2012. The rejection of Dr. Mattioda's candidate left him without one, which would affect his scientific publishing productivity, and Dr. Lee's inconsistent reasoning simply illustrates the ongoing and pervasive harassment Dr. Mattioda suffered at AMES. Furthermore, when Dr. Dotson informed Dr. Mattioda that his candidate was not selected, Dr. Mattioda inquired why Dr. Lee, who chaired the committee, seemed to get an NPP selected every time. Dr. Dotson responded that it was not unusual for a successful researcher to have multiple NPP's selected. (3-ER-388-389.)

In December 2012, Dr. Mattioda had been put in for the GS-15 promotion. Dr. Mattioda had been on sick leave at the time, due to his second hip surgery of the year. When he attended the holiday party on crutches, Dr. Lee approached him to tell him he should not get his "hopes up" about the GS15 promotion, as people normally do not get promoted on their first try. Despite Dr. Lee's derogatory comments, Dr. Mattioda did in fact get the promotion. (3-ER-389.)

In May 2013, during Dr. Mattioda's annual employee review, he raised concerns to Dr. Dotson that his travel restrictions related to his disability and surgeries would affect his career. On one hand, Dr. Dotson instructed him not to worry about his inability to travel. But she also simultaneously warned him that

his inability to travel would lower his review ratings, which would affect Dr. Mattioda's annual bonuses.  (*Id*.)

Between September 2013 and February 2014, Dr. Mattioda proposed to put an experiment on the exposure platform of the International Space Station ("ISS"). But the proposal ultimately died when Dr. Lee and Dr. Dotson refused to support it, even though they frequently offer to advocate for such proposals by non-disabled scientists at AMES and Dr. Mattioda had repeatedly requested their assistance in this instance.  (*Id*.)

On October 30, 2014, during his mid-year performance review, Dr. Dotson presented Dr. Mattioda a sheet of paper with columns and rankings on it. According to Dr. Dotson, the list showed the proposal success rates of the civil servants in the branch.  She pointed to the lowest value on the list saying, "Do you know who this is right here?"  When Dr. Mattioda said he did not, she responded with, "It's you."  This statement was made to further embarrass and humiliate Dr. Mattioda.  Dr. Dotson did not explain her methodology or methods to Dr. Mattioda regarding how she came up with the rankings. (3-ER-390.)

This harassment of Dr. Lee continued for years.  At a January 26, 2016 conference dinner, Dr. Lee commented to Dr. Mattioda's colleagues, "Good luck getting him to do anything."  Such comments were so commonplace that Dr. Mattioda's peers have characterized them as "background noise."  (3-ER-395-396.)

13

During a February 9, 2017, meeting with other scientists, Dr. Mattioda suggested he could help oversee and support the work of Dr. Christian Boersma on the Lab Astro Work Package. When Dr. Mattioda volunteered to do so, Dr. Lee became upset, shouting at Dr. Mattioda in front of the other scientists, "Well you do realize you are going to have to manage him!" Taking into account Dr. Lee's long history of disparaging remarks and harassing treatment, it was clear Dr. Lee was continuing to apply stereotypes of Dr. Mattioda's abilities based on his disability. (3-ER-403-404.)

Later, after Dr. Mattioda had initiated the EEO process, Dr. Lee began referring to him as a "troublemaker." Dr. Mattioda shared this concern with Dr. Steve Howell over email in April 2017. (3-ER-405-406.)

### d. Dr. Dotson's Harassment of Dr. Mattioda Escalates in 2013

In January 2015, Dr. Dotson refused to support Dr. Mattioda's SIMPLEX proposal – a complex project that required coordination among a number of AMES units and personnel, along with budgeting from multiple sources. AMES' new business office typically helps with proposals of this magnitude because of their complexity and size. Initially, Dr. Dotson indicated she would "take care" of any problems arising on the matter. But after the business office indicated it could not provide support until the end of February 2015, Dr. Dotson simply replied, "Oh well, they are very busy with other proposals." She then walked away, never

14

providing any assistance to Dr. Mattioda, and instead indicated that his withholding the proposal was the "right thing to do." Notably, Dr. Dotson regularly provides her support and advocacy to research proposals made by other, non-disabled researchers, but regularly dismisses Dr. Mattioda's requests for support. (3-ER-391.)

On March 19, 2015, Dr. Mattioda was diagnosed with an ear infection and was instructed by his doctor not to fly to the 2015 ACS meeting in Denver, scheduled a few days later. Upon trying to make alternative arrangements, Dr. Mattioda learned that Dr. Allamandola had to argue with Dr. Lee to permit Dr. Mattioda to be involved in the conference in the first place. When Dr. Mattioda subsequently proposed to appear at the conference by doing a video presentation, Dr. Lee lied and said that the conference did not permit video conferencing. (3-ER-391-392.) Dr. Dotson later cited Dr. Mattioda's absence from the conference at his next performance review in May 2015, proclaiming, "I need to know if you are still committed to being a high-profile scientist at NASA!" Dr. Mattioda was embarrassed and humiliated by Dr. Dotson's comments, especially given that his doctor would not let him fly and Dr. Lee lied about the ability to present remotely. (3-ER-392.)

During that same performance review, Dr. Dotson lowered Dr. Mattioda's performance rating because he "failed" to submit the SIMPLEX proposal, a move

that shocked Dr. Mattioda because it was Dr. Dotson herself who advised him not to submit the proposal. This lowered rating also failed to take into account proposals on several instrument developments and his scientific invitations to become a speaker. At the meeting, Dr. Dotson eventually conceded the SIMPLEX proposal should have at been, at worst, a "neutral" factor, at which point Dr. Mattioda requested a reconsideration of his rating. (*Id*.) Dr. Dotson later rejected Dr. Mattioda's reconsideration request, and then required him to sign and date the rejection letter personally, which was a harassing action because the agency's regulations required her to sign her name, not Dr. Mattioda. (3-ER-393.)

On August 21, 2015, after previously being discouraged from pursuing EEO remedies, Dr. Mattioda finally contacted an EEO counselor to file a complaint concerning the years-long harassment he had been receiving while at NASA. (*See* 1-ER-68; *see also* 3-ER-385, -393-394.) After AMES had failed to resolve the complaint, Dr. Mattioda had no choice but to commence the instant litigation. (*See* 3-ER-395.)

### e. Dr. Lee Influences A Selection Committee Not to Hire Dr. Mattioda for Senior Scientist

In November 2016, NASA Ames' Dr. Lee, Dr. Bicay, Dr. Thomas Edwards, and Center Director, Dr. Eugene Tu, exchanged e-mails to determine the duties and responsibilities for a new Senior Technical Scientist position ("ST Position"). With Dr. Lee's support, Dr. Bicay initially recommended Dr. Scott Sandford be

appointed to fill the position. Center Director, Dr. Tu, however, opposed a direct appointment, indicating he wanted scientists to compete for the position in order to provide for "diversity of our ST Positions." (2-ER-256; 2-ER-130-134).

The open ST Position was announced by NASA on June 5, 2017. (2-ER-268.) The job announcement mentioned "supporting space mission experience" but said nothing about "deep space" mission experience. The announcement also said nothing about using a scientist's *h*-index (publication citations and listings) as a qualifying factor. In fact, the job announcement warned that the mere number of publications or speaking engagements was not to be unduly emphasized, and that "the quality and scientific/technical significance" was more important. (*See id*.; *see also* 2-ER-258-259).

When Dr. Mattioda applied for the position, he specified both that he was qualified, and that under Schedule A (an affirmative action Schedule for federal employees with disabilities), he was also eligible for the position. Dr. Mattioda later discovered that NASA "lost" the disability information from Schedule A, and never notified his "diversity status" to the Panel members. (2-ER-260.)

NASA's HR division selected Dr. Sandford, Dr. Mattioda, and Dr. Farid Salama as the three most qualified scientists for the ST Position. NASA announced their three names to the ST Panel. HR also sent a 58-page packet of information from Dr. Sandford, Dr. Salama, and Dr. Mattioda as to how each felt he met the

five Evaluation Criteria and two General Criteria set out for the ST Position. Dr. Sandford and Dr. Salama supplied an $h$-index for their publications, but Dr. Mattioda did not, since neither the job announcement or the seven criteria mentioned an $h$-index. (2-ER-260; 2-ER-146-204.)

Of the three candidates, Dr. Mattioda was arguably the "most qualified." As he explained in his deposition, Dr. Mattioda (a) had management experience, (b) was pursuing new directions for research, (c) was building relationships with scientists all over the world, (d) was better able to unify the scientific groups, (e) had built relationships with headquarters personnel, (f) was working with headquarters on joint funding, and (g) the job was an astrophysics position, and not an astrobiology position (which would have been better suited for Dr. Sanford). (2-ER-102, 103-104; 2-ER-123.)

Dr. Lee was initially chosen to serve on the selection panel for the ST Position, along with three others: Dr. Howell, Dr. Bernstein, and Dr. Zornetzer (the Panel Chair). (2-ER-258; 2-ER-136-137). Dr. Howell was subsequently replaced by Mr. Mark Fonda, who had previously described Dr. Mattioda as being a "7-year old" and "acting like a spoiled child" in an email exchange with Dr. Lee after he missed work from surgeries in 2009-2011. Despite those prejudices, NASA left Dr. Fonda on the Panel. (2-ER-259; 2-ER-128-129.)

Given Dr. Lee's history with Dr. Mattioda, he recognized he needed to recuse himself from the Panel. Immediately before doing so, however, Dr. Lee conducted his own research into *h*-index ratings for the three scientists. Dr. Lee apparently inputted information of his choosing into the Web of Science website, printed out WOS results which ascribed Mattioda the "lowest" *h*-index number. Dr. Lee then "delivered" the WOS index numbers to "help" the Panel, just minutes before he recused himself. Notably, Dr. Lee's *h*-index data includes data from years where Mattioda was either recovering from surgery, or on leave related to his disabilities. Dr. Lee clearly selected an *h*-index which showed the highest possible values for Sandford, while offering the lowest value for Dr. Mattioda. (2-ER-260; 2-ER-205-228.)

In addition to the inherent limitations of the *h*-index, NASA failed to "equalize" the same years of publication contributions between Dr. Mattioda and Dr. Sandford. For example, the Panel never compared Dr. Mattioda's "active" years (without time off for disability leave or surgeries) against Dr. Sandford's comparable years. In that sense, the *h*-index naturally creates an inevitable bias against a person who has been absent due to disability leave. A better criterion might have been the "*m*-index" which measures publications by comparable periods of time, but Dr. Lee did not offer such data to the Panel. (2-ER-261.)

19

In September, 2017 the ST Panel selected Dr. Sandford as the "most highly selectable" person for the ST Position. (2-ER-263; 128-240.) Notably, the Panel reached that decision in large part based on the $h$-index material provided by the recused Dr. Lee, and an after-the-fact emphasis on "deep space" experience. (See 2-ER-231-235.) None of the panel members considered Dr. Tu's "diversity" criterion. Nor did a single panel member discuss the federal government's goal of advancing persons with disabilities. (2-ER-105-121, -123-124.)

Evidence was submitted that the Panel's ultimate reasoning was inconsistent with other job selections, as well as this specific job announcement. For example, Dr. Howell has openly criticized the $h$-index as not used on any of his selection panels and "not critical" as a metric for selecting scientists. He has also never heard the term "deep space mission experience." (2-ER-101; 2-ER-123.) The Panel clearly disregarded the instruction not to place too much emphasis on the number of publications. (2-ER-258-259.) Nor did one of the panelist's focus on Dr. Sanford's "deep space" experience align with the position description, and appeared to be a factor created after-the-fact. (2-ER-264.)

## II.     PROCEDURAL HISTORY

This case is a consolidated action from four separate lawsuits, filed on June 2, 5, 11, and July 6, 2020. The four cases were consolidated on September 3,

2020, and a First Amended Complaint ("FAC") was filed for the newly consolidated action on September 14, 2020.

On January 8, 2021, the district court ruled on Defendants' motion to dismiss the FAC under Rules 12(b)(1) and 12(b)(6). As relevant here, the court dismissed without leave to amend any and all claims based on conduct occurring prior to July 7, 2015 for Plaintiff's failure to file a timely EEO charge. (1-ER-68-69.) Although the court properly recognized that the alleged harassment predating July 7, 2015 "was part of the same unlawful employment practice as the harassment that occurred after that date," and therefore timely, the court nonetheless dismissed the harassment claim for failure to state a claim. Specifically, citing *Iqbal*, the Court reasoned it was not required to accept conclusory allegations as true and, as a result, Dr. Mattioda failed to draw a link between the harassing comments and his disability. The court separately concluded that Dr. Mattioda failed to allege conduct that was "severe and pervasive." (1-ER-72-73.) In response to the order, Dr. Mattioda filed a Second Amended Complaint ("SAC") on January 29, 2021. (3-ER-380-415.)

The trial court then ruled on a second motion by Defendants under Rule 12(b)(6) on April 26, 2021. In this ruling, the court dismissed the harassment claim in its entirety with prejudice. The court did not address whether the alleged conduct was severe or pervasive, but, citing its previous decision, concluded

21

nevertheless that Dr. Mattioda still failed to establish a link between the harassment and his disability. (1-ER-41-42.)

Several other discrete allegations of discrimination survived the Rule 12(b)(6) motions and proceeded through discovery. Of particular relevance to the instant appeal, the allegation that NASA discriminated against Dr. Mattioda in the selection process for the Senior Scientist position remained actionable. (*See* 1-ER-24-31.)

On February 20, 2022, Defendants moved for summary judgment on Dr. Mattioda's remaining claims of discrimination. (*Id.*) As for the selection process for the Senior Scientist position, the district court remarkably concluded as a matter of law that there was no evidence of discriminatory animus on behalf of Dr. Lee, such that his influence over the process was discriminatory. (1-ER-26-27.) Apparently construing the remaining facts against Plaintiff, the district court then concluded the other criteria used by the committee were not improper. (*See* 1-ER-28-31.)

The only claim of discrimination that survived the court's summary judgment ruling related to Dr. Dotson's downgraded performance review of Dr. Mattioda on account of his inability to travel. (1-ER-17-21.) Thereafter, the parties settled that limited claim, and the stipulated to a judgment for the remainder

of the case for appellate purposes.  The court entered judgment on May 3, 2022.

(1-ER-2-10.)

On June 13, 2022, Dr. Mattioda filed his Notice of Appeal.  (2-ER-80-82.)

## III.    STANDARD OF REVIEW

On appeal, a district court's decision to dismiss for failure to state a claim

under Rule 12(b)(6) is reviewed *de novo*.  *Douglas v. Noelle*, 567 F.3d 1103, 1106

(9th Cir. 2009).  "All allegations of material fact are taken as true and construed in

the light most favorable to the nonmoving party."  *Id* (quoting *Silvas v. E*Trade*

*Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir.2008)); *see also Arizona Students'*

*Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016).  Similarly, a

district court's grant of summary judgment is also reviewed *de novo*.  *Lopez-*

*Valenzuela v. Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014).

## IV.    LEGAL ARGUMENT

Congress enacted the Rehabilitation Act of 1973 to "empower qualified

individuals with disabilities" and "to ensure that the Federal Government plays a

leadership role in promoting the employment of individuals with disabilities."  29

U.S.C. § 701(b).  In other words, "[t]he Federal Government shall be a model

employer of individuals with disabilities."  29 C.F.R. § 1614.203(b).

Section 501(b) of the Rehabilitation Act broadly prohibits discrimination

against disabled federal employees, and requires federal agencies to engage in

"affirmative action" to hire and promote individuals with disabilities. *See* 29 C.F.R. § 1614.203(b); 29 U.S.C. § 791(b). "For federal employers, therefore, nondiscrimination requires more than mere 'equal treatment' of disabled employees and job applicants, and encompasses an affirmative duty to meet the needs of disabled workers and to broaden their employment opportunities." *Woodman v. Runyon*, 132 F.3d 1330, 1337-1338 (10th Cir. 1997).

Section 501 of the Rehabilitation expressly incorporates the same standards used to determine discrimination under the Americans with Disabilities Act. 29 U.S.C 791(f); *Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1229 n. 3 (9th Cir.2002) (noting that cases interpreting the ADA and the Rehabilitation Act are "interchangeable"). Accordingly, there is a cause of action for a disabled federal employee who faces e.g., a hostile work environment on account of disability. *See Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001); *Sanders v. Kerry*, 180 F. Supp. 3d 35 (D.D.C. 2016); *Williams v. Modly*, 796 F. App'x 378, 380–81 (9th Cir. 2020).

Here, Dr. Mattioda appeals two discrete decisions from below, where the district court's analysis under the Rehabilitation Act erred. First, the district court should have denied NASA's Rule 12(b)(6) motion as to Dr. Mattioda's claims for harassment. Second, the court erred by granting summary judgment in favor of

NASA on his claim that the agency discriminated against him the selection process for the ST Position.

### a. The District Court Erred By Dismissing Dr. Mattioda's Harassment Claim Under Rule 12(b)(6)

A discriminatorily abusive work environment offends the very idea of workplace equality. Even an environment that "does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Such circumstances may include, for example, the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*., at 23.

### i. Dr. Mattioda Adequately Pleaded Harassment

It has long been established that "that an employment discrimination plaintiff need not plead a prima facie case of discrimination," and that even conclusory allegations may still state a claim. *Swierkiewicz v. Sorema N. A*., 534 U.S. 506, 514–15 (2002); *see also Maduka v. Sunrise Hosp*., 375 F.3d 909, 912–13 (9th Cir. 2004) (trial court erred by requiring plaintiff to plead "facts constituting

either direct or circumstantial evidence of discrimination.").  This standard of

pleading from *Swierkiewicz* and *Maduka* remains good law even after

*Iqbal/Twombly*.  In fact, *Twombly* expressly affirmed that it was not overturning

the *Swierkiewicz* approach, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569–70

(2007), and courts have continued applying the standard in employment

discrimination cases post-*Iqbal/Twombly*, *see Starr v. Baca*, 652 F.3d 1202, 1215–

16 (9th Cir. 2011) (reconciling *Swierkiewicz* with *Twombly*); *Sheppard v. David*

*Evans & Assoc.*, 694 F.3d 1045, 1050 n. 2 (9th Cir. 2012); *Gillette v. Stater Bros.*

*Markets*, No. EDCV191292JVSKKX, 2019 WL 8017735, at *7 (C.D. Cal. Sept.

23, 2019); *Gollah v. City of Millersburg*, No. 6:18-CV-01412-MC, 2018 WL

6183268, at *3 (D. Or. Nov. 27, 2018); *Hittle v. City of Stockton*, No.

212CV00766TLNKJN, 2018 WL 1367451, at *7 (E.D. Cal. Mar. 16, 2018)

("While *Swierkiewicz* was decided before *Iqbal* and *Twombly*, with respect to a

claim to which the McDonnell Douglas framework is applicable, it remains the law

that a plaintiff 'is not required to plead a prima facie case of discrimination in order

to survive a motion to dismiss.'"); *Heldt v. Tata Consultancy Servs., Ltd*., 132 F.

Supp. 3d 1185, 1190 (N.D. Cal. 2015).

As a result, "all that is required is 'a short and plain statement of the claim

showing that the pleader is entitled to relief,'" which simply "must give the

defendant fair notice of the basis for the plaintiff's claims."  *Wong v. United States*,

373 F.3d 952, 969 (9th Cir. 2004) (quoting Fed. R. Civ. P. 8(a)(2), and citing

*Swierkiewicz*, 534 U.S. at 512).

In order to state a claim of disability-based harassment, the plaintiff must

plead: (1) that he belongs to a protected group; (2) that he was subjected to

unwelcome harassment; (3) that the harassment complained of was based on his

disability or disabilities; (4) that the harassment complained of affected a term,

condition, or privilege of employment; and (5) that the employer knew or should

have known of the harassment and failed to take prompt, remedial action.

*Flowers*, 247 F.3d 229, 235-36.[4]  In evaluating such elements, courts are directed

to look at the "totality of the circumstances," and to consider the "cumulative

effect of the conduct at issue."  *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 444 (9th

Cir. 2017) (12-year history must be reviewed to evaluate the illegality of

harassment); *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d

Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but

only on its entire performance, and similarly, a discrimination analysis must

concentrate not on individual incidents, but on the overall scenario.")*; Yonemoto v.

McDonald*, 114 F. Supp. 3d 1067, 1103 (D. Haw. 2015), *aff'd sub nom. Yonemoto

v. Shulkin*, 725 F. App'x 482 (9th Cir. 2018); ("Context matters" in Rehabilitation

---

[4] As the trial court's dispositive ruling only addressed the third element – that the
harassment was *based on* disability or disabilities – this brief will focus on that
element. (*See* 1-ER-41-42.)

Act cases); *Accardi v. Superior Ct.*, 17 Cal. App. 4th 341, 351 (1993), as modified on denial of reh'g (Aug. 20, 1993) ("A single photograph of two sumo wrestlers engaged in combat may give the impression they are dancing a pas de deux. One must witness the entire match to appreciate its meaning and significance.").

Examining the "totality of the circumstances," it is clear that conduct can constitute actionable harassment even if the conduct is not facially about the employee's protected status. For example, in *Flowers*, the employee's supervisor avoided socializing with her, intercepted her phone calls, eavesdropped on her conversations, and hovered around her desk. *Flowers*, 247 F.3d at 236-237. In a vacuum, none of these facts may indicate disability-based harassment, but when considered in the broader context that the acts began "almost immediately" after the employee disclosed her disability status to her supervisor, then the potential link between the disability and the harassment becomes evident. *See id*.

Similarly, in *Ray v. Henderson*, this Court addressed a hostile work environment claim involving an employee who complained about the treatment of women at a post office. 217 F.3d 1234 (9th Cir. 2000). After he made his complaint, his supervisors "regularly yelled at him during staff meetings; they called him a 'liar,' a 'troublemaker,' and a 'rabble rouser,' and told him to 'shut up.' Additionally, Ray was subjected to a number of pranks, and was falsely accused of misconduct." *Id*., at 1245. These facts were sufficient not just to

28

survive a motion to dismiss, but to survive summary judgment. *Id.*, at 1246. Again, viewed in a vacuum, each standalone fact in *Ray* may not mean very much, but when viewed in broader context, they illustrate a hostile environment.

Here, the SAC goes into exhaustive detail about the harassment experienced by Dr. Mattioda at NASA, which is more than sufficient to state a claim of harassment when properly considering the "totality of the circumstances." First, it lays out numerous instances when his supervisors humiliated or otherwise admonished him simply for making reasonable accommodations requests. For example, soon after Dr. Mattioda disclosed his disabilities to AMES and made his first request for travel accommodations, Dr. Lee ridiculed him, saying, "I don't know why you can't just tough it out or suck it up and travel coach to that meeting." (3-ER-382.) The message that a disabled person is somehow expected to overcome physical limitations simply by "tough[ing] it out or suck[ing] it up" shows utter disregard for the disabling condition itself, and is demeaning, demoralizing, and dehumanizing to the disabled person who is expected to disregard his physical limitations in order to perform his job, which is contrary to the broad purposes of the Rehabilitation Act.

And such comments were not limited to Dr. Lee. Dr. Dotson explicitly warned Dr. Mattioda that he would "lose [his] job" if he continued to make reasonable accommodation requests, mocked him for not having a "magic pot of

29

$," and demanded that he find his own funding for such accommodations. (3-ER-386-387.) On one instance, when Dr. Mattioda's disabilities prevented him from attending a conference in-person (but he was willing to appear virtually), Dr. Dotson questioned his "commitment to being a high-profile scientist." (3-ER-392.)[5] Needless to say, Dr. Mattioda is an esteemed scientist, and Dr. Dotson's remarks had nothing to do with his performance, but *only* his physical limitations. Also, Dr. Lee required Dr. Mattioda, and no one else, to provide exhaustive cost analyses of reasonable accommodations and travel expenses on work packages, and later required that he fund such accommodations on his own. (3-ER-398, -404-405.)

Moreover, Dr. Mattioda had to endure many comments and actions that imputed stereotypes on him as a disabled employee. It should be axiomatic that disability does not mean inability. Yet, such ableist attitudes and stereotypes seem to persist even decades after the federal law began to protect disabled employees. For example, in *Haysman v. Food Lion, Inc*., the employer characterized its concerns about a disabled employee "as being based not on Haysman's disability, but because he 'constantly complained, rarely worked his scheduled hours, overstated his physical complaints, an wanted to avoid work.'" 893 F. Supp. 1092,

---

[5] Notably, the adverse performance evaluation accompanying that harassing comment was a discrete discriminatory action that survived Rule 12(b)(6) and summary judgment. (*See* 1-ER-16-22.)

1108 (S.D. Ga. 1995). But the trial court recognized that "a jury could also infer from the evidence that these conclusory justifications are merely pretext and represent the kind of demeaning stereotypes that the ADA and other anti-discrimination laws seek to address." *Id*. Allowing such stereotypes of persist would be contrary to the purposes of the discrimination law. *Leiken v. Squaw Valley Ski Corp*., No. CIV. S-93-1622 LKK, 1994 WL 494298, at *9 (E.D. Cal. June 28, 1994) (safety requirements for public accommodation "must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."); *Reinhardt v. Burlington N. Santa Fe R.R*., 846 F. Supp. 2d 1108, 1114 n. 4 (D. Mont. 2012) (consideration of reasonable accommodation for someone with mental disability "must rely on objective, factual evidence—not on subjective perceptions, irrational fears, patronizing attitudes, or stereotypes"); *McCann v. City of Eugene ex rel. Fire & EMS Dep't*, 833 F. Supp. 2d 1250 (D. Or. 2011); *see also* 29 U.S.C. § 701(b) (noting the purposes of the Rehabilitation Act include "to empower individuals with disabilities" and "maximize" their employment opportunities).

There was a plethora of such comments, based on myth and stereotype, from Dr. Mattioda's own supervisor, Dr. Lee. Dr. Lee accused Dr. Mattioda of having another researcher "doing all the work for [him]." (3-ER-384.) That researcher was subsequently in the position where he had to photograph Dr. Mattioda at a

presentation just to prove to Dr. Lee that he, was in fact, working on a project. (3-ER-387.) When Dr. Mattioda was up for a GS-15 promotion, Dr. Lee mocked his ability to earn the promotion – a promotion that he did, in fact, receive. (3-ER-389.) Dr. Lee once yelled at Dr. Mattioda in front of others when Dr. Mattioda had the audacity to suggest he had the ability to manage and oversee another researcher. (3-ER-403-404.) During a conference dinner, Dr. Lee commented to Dr. Mattioda's colleagues, "Good luck getting him to do anything." Such comments were so commonplace that Dr. Mattioda's peers have characterized them as "background noise." (3-ER-395-396.) Dr. Lee even suggested Dr. Mattioda perform extra work on vacation days. (3-ER-383-384.) A fellow researcher, Dr. Allamandola, confirmed comments from Dr. Lee made in other meetings that specifically linked these comments to stereotypes, specifically that Dr. Lee believed Dr. Mattioda not only to be "lazy" but to be using his medical and disability issues to avoid work. (3-ER-391-392.)

It is also important that many of these perceptions about Dr. Mattioda that Dr. Lee placed upon him are belied by other concrete facts. Dr. Mattioda is an accomplished NASA scientists, he earns promotions, and was (at a minimum) a serious contender for a highly coveted Senior Scientist position. Viewing Dr. Lee's comments in a light most favorable to the plaintiff, they can only be attributed to stereotypes light of the fact that he is such a high performer.

Dr. Lee and Dr. Dotson knew their conduct was having an effect on Dr. Mattioda, as he had engaged the EEO process, but Dr. Mattioda's engagement of the EEO process only prompted some of the harassment to escalate. By April 2017 – well after the initiation of multiple EEO complaints – Dr. Mattioda shared with others his concern that Dr. Lee began referring to him as a "troublemaker." (3-ER-405-406.) As this Court address in Ray, such comments that relate to a plaintiff's filing of complaints are part of the context that illustrates a hostile environment. *Ray*, 217 F.3d at 1245 (noting that the plaintiff was regularly called a "troublemaker").

Viewing the full context of Dr. Mattioda's allegations, it is clear that Dr. Lee and Dr. Dotson expressed frequent hostility towards him for his reasonable accommodations requests, Dr. Lee imposed characterizations on him that could only be based on stereotype, and he was labeled a "troublemaker" after speaking out about this treatment. The fact that Dr. Mattioda faced this hostility from multiple supervisors over several years illustrates just how severe and pervasive it has been. In short, there are plenty of facts alleged in the SAC to support a claim for harassment.

//

33

### ii. The District Court Applied the Wrong Standard in Evaluating Dr. Mattioda's Complaint and Declined to View the Full Context of the Hostile Acts

Despite the extensive nature of the harassment, the district court erred by applying an overly strict standard to the pleadings, and declining to view the many hostile acts in full context.

First, the trial court applied the incorrect pleading standard to the complaint. It in its first order, it simply cited *Iqbal* for the proposition that "[t]he Court is not required to accept conclusory allegations as true." (1-ER-72.) But this simplified standard ignores the nuances related to employment discrimination claims generally established by *Swierkiewicz* and progeny. That distinction is important because, without the benefit of discovery, discrimination plaintiffs may not always be able to allege every single fact that makes out a prima facie case for discrimination.

The trial court's analysis here exemplifies that distinction. Looking to some of the above remarks by Dr. Lee, the trial court concluded that "[m]any, if not all, of these alleged remarks have no readily apparent link to Plaintiff's disability." (1-ER-72; see also 1-ER-41.) But many of the remarks about Dr. Mattioda's perceived laziness happen to correspond to old stereotypes of disabled people, and Dr. Mattioda specifically alleged that each of those remarks was made on account of his disability. Moreover, observations from Dr. Allamandola linked Dr. Lee's

comments to a specific animus that Dr. Mattioda was using his disability to avoid work.

Even the comments the trial court found to be linked to Dr. Mattioda's disability were expressly disregarded. For example, Dr. Mattioda was mocked and admonished on multiple occasions for requesting reasonable accommodations. The trial court expressly disregarded some of these facts (and omitted other facts related to such harassment) simply because the claim for the denial of reasonable accommodations was time-barred. But these comments, including Dr. Lee's insistence that Dr. Mattioda just "suck it up" are not themselves discrete acts and provide crucial context for a hostile work environment claim. Because the full context of such claims is important, these harassing facts cannot simply be extricated as if they never happened just because they happen to reference reasonable accommodations. "Under the totality of the circumstances analysis, the district court should not carve the work environment into a series of discrete incidents…" *Burns v. McGregor Elec. Indus., Inc*., 955 F.2d 559, 564 (8th Cir. 1992); *see also Andrews*, 895 F.2d at 1484; *Zetwick*, 850 F.3d at 444. In this case, the cumulative effect of years of harassing comments – many of which were expressly tied to Dr. Mattioda's disability, and some of which applied stereotypes – was a hostile work environment.

Applying the proper pleading standard, and looking to the full context of the alleged harassment, Dr. Mattioda has sufficiently pleaded that the harassment was on account of his disability.

### b. There Were Genuine Issues of Material Fact on Dr. Mattioda's Claim Regarding NASA's Failure to Select him for the ST Position.

The trial court also erroneously granted summary judgment in favor of NASA on Dr. Mattioda's discrimination claim concerning the selection of another scientist for the ST Position.

At the summary judgment stage of a case under Section 501, the trial court applies the well-known *McDonnell Douglas* burden-shifting analysis. *Snead v. Metro. Prop. & Cas. Ins. Co*., 237 F.3d 1080, 1091 (9th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under this framework, the plaintiff has the initial burden to make a prima facie case of discrimination, at which point the burden shifts to the defendant to proffer a non-discriminatory justification for its decision, and then the burden shifts back to the plaintiff to establish pretext. *Id*.

Because Dr. Mattioda established genuine issues of material fact on each of these steps, his claim regarding the selection of the ST Position should go to trial.

//

36

### i. Dr. Mattioda Made a Prima Facie Case Through Dr. Lee's Animus and His Influence on the Decision

"Making a prima facie showing of employment discrimination is not an onerous burden." *Snead*, 237 F.3d at 1091. To state a prima facie case under Section 501, a plaintiff must "demonstrate that (1) []he is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of [his] disability." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007); *Reynolds v. Brock*, 815 F.2d 571, 573–574 (9th Cir. 1987). On the causation factor, a plaintiff must simply demonstrate his disability was a motivating factor behind the discrimination. *See* 29 U.S.C. § 791(f) (adopting standards for ADA, including 42 U.S.C. § 12112, which prohibits discrimination "against a qualified individual with a disability *because of* the disability" (emphasis added)).

Dr. Mattioda met the low burden to make a prima facie case. It cannot be disputed that he is a person with a disability who is otherwise qualified for employment. The first two prongs are thus easily satisfied.

He has also produced enough evidence to create a triable issue as to whether he suffered discrimination because of his disability. The *h*-index methodology necessarily penalizes Dr. Mattioda for periods of disability leave. "The *h*-index is defined as the maximum value of *h* such that the given author has published at least *h* papers that have been cited at least *h* times." (1-ER-26.) As shown in Dr.

Lee's calculations, Dr. Mattioda had no publications while he was out on disability leave, which inevitably had a negative impact on the $h$-index scores prepared by Dr. Lee. (2-ER-207.) There are various ways to calculate an $h$-index score, and there are even alternative scores, such as the $m$-index, which measures publications by comparable periods of time and therefore do not penalize someone for disability-related breaks. (2-ER-261.) But Dr. Lee did not provide such equalized data to the committee.

Moreover, the job announcement did not indicate it would be taking $h$-index scores into account, and in fact emphasized that the quality of publications and engagements was more important than quantity. (2-ER-139-145.) Nor did the evaluation criteria specifically reference $h$-index values. (*See* 2-ER-231.) Nevertheless, Dr. Lee prepared $h$-index calculations for each of the candidates, and circulated his calculations to the selection panel, right before recusing himself from the process. (2-ER-206-228.) The scores prepared by Dr. Lee ranked Dr. Mattioda's $h$-index score the lowest of the three candidates, and Dr. Sandford's score as the highest. (*Id*.)

The $h$-index scores provided by Dr. Lee were clearly a "motivating factor" in the panel's selection of another candidate. In fact, each panelist expressly referenced either $h$-index numbers or some of the underlying data as key components of their rankings. (*See* 2-ER-231 (noting "207 papers in peer

38

reviewed journals"), 232 (referencing the underlying *h*-index values, and also

noting that category, EC2 was the most heavily weighted); and 234 (citing Dr.

Mattioda's "H index of 16").)

Even though Dr. Lee was not the final decisionmaker, his influence over the

panel still points to discrimination.  Under the "cat's paw" theory, even if an

employee "with bias was not the final decisionmaker, the plaintiff can establish a

causal link by proving that 'the biased [employee] influenced or was involved in

the decision or decisionmaking process.'"  *France v. Johnson*, 795 F.3d 1170,

1176 (9th Cir. 2015).  In *France*, which also involved a federal GS-15 employee,

this Court applied the cat's paw theory when the person influencing the process

had (a) been involved in originally creating the position; (b) had deference given to

his opinion and judgments; and (c) recommended who to hire and not to hire.  *Id.*;

*see also Shager v. Upjohn Co.*, 913 F.2d 398, 404-405 (7th Cir. 1990) (biased

employee "tainted" a "the committee's deliberations by portraying [Plaintiff's]

performance to the committee in the worst possible light.").

The district court declined to apply the "cat's paw" theory below because it

erroneously determined that Dr. Lee lacked "discriminatory animus."  (1-ER-28.)

But that decision overlooks the long history of Dr. Lee's comments about Dr.

Mattioda, including his mocking comments to "suck it up" when it came to

reasonable accommodations, and including his application of false stereotypes on Dr. Mattioda's performance, as described above.

The district court also seemed unconcerned with the way the *h*-index necessarily penalized Dr. Mattioda for his periods of disability leave, noting that other NASA positions also applied the *h*-index. (1-ER-29.) But that is beside the point. First, it was quite possible that other positions did not involve disabled applicants who were ultimately prejudiced by the score. Second, one of the panelst who was clearly influenced by Dr. Lee's data had previously criticized the h-index and refused to use it in other selection panels (2-ER-101; 2-ER-123.) Third, it ignores the context of section 501, which requires the federal government not just to prevent discrimination but to take "affirmative action" to "for the hiring, placement, and advancement of individuals with disabilities." 29 U.S.C. § 791(b). NASA falls short of that mandate if it is applying evaluation criteria to disabled employees that may necessarily put them at a disadvantage.

In short, given Dr. Lee's history, there is a genuine issue of material fact as to his discriminatory animus. The *h*-index scores he prepared, which ranked Dr. Mattioda the lowest, unquestionably penalized him for periods of disability leave. And Dr. Lee's scores unquestionably played a "motivating factor" in the panel's selection. Dr. Mattioda has gone well above his "minimal" burden to establish a prima facie case.

40

### ii. NASA Did Not Meet its Burden to Establish a Non-Discriminatory Justification for its Decision

In evaluating NASA's burden, the district court based its short conclusion that it met its burden on the simple fact that "the members of the hiring committee independently came to the unanimous decision that Sandford was [sic] superior candidate." (1-ER-31.) But that cursory rationale is incorrect. As described above, the committee members did not "independently" come to that decision, as they were heavily influenced by the figures provided to them by Dr. Lee. Moreover, it was undisputed that each panel used the *h*-index (or its underlying values), which affected Dr. Mattioda negatively because of his disability.

### iii. Genuine Issues of Material Fact Exist as to Pretext

Many of the same facts supporting Dr. Mattioda's prima facie case also support a showing of pretext. An employee can prove pretext either: (1) "directly, by showing that unlawful discrimination more likely motivated the employer"; or (2) "indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017).

"Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). Here, the years-long

history of comments and treatment by Dr. Lee related to Dr. Mattioda's disability, go well beyond a mere "small amount of direct evidence."

Further, there also exists a considerable amount of indirect evidence of pretext. The *Bergene* Court took into account a number of different factors in denying the plaintiff (a woman) a promotion in favor of another (male) candidate. Specifically, the Court noted the absence of other female managers, comments from her supervisor that arguably referenced her claims of employment discrimination, and the changing criteria for the position that the company then used to support its position that the male candidate was better qualified. *Bergene*, 272 F.3d at 1142-43. Here, there was not only an absence of disabled employees in this position and comments from supervisors, but the criteria changed throughout the selection process when Dr. Lee suddenly provided the *h*-index scores he calculated upon his recusal (which were then heavily weighted), which ensured Mattioda would not be selected.

In summary, a jury should determine Dr. Lee's discriminatory intent, the extent to which it influenced the panel, and ultimately, whether pretext exists for the selection.

//

## **<u>CONCLUSION</u>**

For the reasons stated above, Plaintiff/Appellant asks this court to reverse the decision of the district court, and permit him to pursue his claims for harassment, while permitting his discrimination claim based on the selection of the ST Position to go to trial.

Respectfully submitted,

*/s/ Erika Heath*
Erika A. Heath
DUCKWORTH & PETERS LLP
369 Pine Street, Suite 410
San Francisco, CA 94104
(415) 433-0333
erika@duckworthpeters.com

*Attorney for Plaintiff/Appellant*
*Andrew Mattioda*

43

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Local Rule 28-2.6, Plaintiff/Appellant hereby states that there are no related cases in this Court.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Ninth Circuit Local Rule 29(d) because this brief contains 9,588 words, excluding parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This filing complies with Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

3.    This brief has been scanned for viruses pursuant to Rule 27(h)(2).

*/s/ Erika Heath*
Erika A. Heath
Attorney for Plaintiff/Appellant

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 21, 2022.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Erika Heath*
Erika A. Heath
Attorney for Plaintiff/Appellant