No. 22-15889

IN THE

# UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

ANDREW MATTIODA,
*Appellant*,

– v. –

CLARENCE WILLIAM NELSON II, in his official capacity as Administrator,
National Aeronautics and Space Administration;
and
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,
an Agency of the United States,
*Appellees*.

On Appeal from the United States District Court
For the Northern District of California
Docket No. 5:20-cv-03662-SVK

**APPELLANT'S REPLY BRIEF**

Erika A. Heath
DUCKWORTH & PETERS LLP
369 Pine Street, Suite 410
San Francisco, CA 94104
(415) 433-0333
erika@duckworthpeters.com

*Attorney for Plaintiff/Appellant*
*Andrew Mattioda*

April 10, 2023

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

LEGAL ARGUMENT .......................................................................2

    a.  Appellee's Brief Departs from the "Totality of the Circumstances" Test Used in Harassment Cases ......................................................................2

        i.    In Arguing the Lack of a Nexus Between Dr. Mattioda's Disability and the Harassment, Appellees Ignore the Actual Nexus. ......................................3

        ii.   The Harassing Conduct was Both Severe and Pervasive.........................8

        iii.  Appellees Adopt the Trial Court's Incorrect Pleading Standard. ............11

    b.  Contrary to Appellee's Arguments, the Jury Should Decide Whether Dr. Mattioda was Subjected to Discrimination in the Selection of the ST Position..14

        i.    Appellees Misconstrue the Minimal Showing Required for Dr. Mattioda to Meet his Prima Facie Showing ...................................................................15

        ii.   Appellees do not Show a Legitimate Non-Discriminatory Reason for the Decision that Undoes the Tainted Process.......................................................21

        iii.  There Also Remains a Genuine Issue of Material Fact as to Pretext ......22

CONCLUSION ..............................................................................23

CERTIFICATE OF COMPLIANCE.......................................................25

CERTIFICATE OF SERVICE ...........................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Andrews v. City of Philadelphia*,
    895 F.2d 1469 (3d Cir. 1990) .................................................................. 12

*Bergene v. Salt River Project Agr. Imp. & Power Dist.*,
    272 F.3d 1136 (9th Cir. 2001) ................................................................ 22

*Brooks v. City of San Mateo*,
    229 F.3d 917 (9th Cir. 2000) ....................................................................8

*Chuang v. Univ. of California Davis Bd. of Trustees*,
    225 F.3d 1115 (9th Cir. 2000) ................................................................ 15

*Davis v. Omni-Care*,
    482 F. App'x 102 (6th Cir. 2012)........................................................... 20

*Dee v. Vintage Petroleum, Inc.*,
    106 Cal. App. 4th 30 (2003) ......................................................................8

*Douglas v. Noelle*,
    567 F.3d 1103 (9th Cir. 2009) ................................................................ 12

*Ellison v. Brady*,
    924 F.2d 872 (9th Cir.1991) .................................................................. 10

*Flowers v. S. Reg'l Physician Servs. Inc.*,
    247 F.3d 229 (5th Cir. 2001) ..................................................... 11, 12, 13

*France v. Johnson*,
    795 F.3d 1170 (9th Cir. 2015) ................................................................ 16

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993)............................................................................. 8, 13

*Haysman v. Food Lion, Inc.*,
    893 F. Supp. 1092 (S.D. Ga. 1995) ..........................................................6

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) .................................................................. 16

*Lam v. Univ. of Hawai'i*,
    40 F.3d 1551 (9th Cir. 1994) ................................................................. 16

*Maduka v. Sunrise Hosp.*,
    375 F.3d 909 (9th Cir. 2004) ................................................................. 14

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...................................................................... 15, 16

*Nichols v. Azteca Restaurant Enterprises, Inc.*,
    256 F.3d 864 (9th Cir. 2001) ................................................................. 10

*Peters v. Shamrock Foods Co.*,
    262 F. App'x 30 (9th Cir. 2007)............................................................. 22

*Petitti v. New England Tel. & Tel. Co*,
    909 F.2d 28 (1st Cir. 1990)................................................................... 20

*Porter v. California Dep't of Corr..*,
    419 F.3d 885 (9th Cir. 2005) ................................................................. 23

*Pullman–Standard v. Swint*,
    456 U.S. 273 (1982)............................................................................. 20

*Ray v. Henderson*,
    217 F.3d 1234 (9th Cir. 2000) ................................................. 11, 12, 13

*Reynaga v. Roseburg Forest Prod.*,
    847 F.3d 678 (9th Cir. 2017) ................................................................. 11

*Rodgers v. Western-Southern Life Insurance*,
    12 F.3d 668 (7th Cir. 1993) .....................................................................8

*Shager v. Upjohn Co.*,
    913 F.2d 398 (7th Cir. 1990) ................................................................. 16

*Snead v. Metro. Prop. & Cas. Ins. Co.*,
    237 F.3d 1080 (9th Cir. 2001) ................................................................. 15

*Steiner v. Showboat Operating Co.*,
    25 F.3d 1459 (9th Cir. 1994) ................................................................. 11

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002) ................................................................. 14

*Viana v. FedEx Corp. Servs., Inc.*,
    728 F. App'x 642 (9th Cir. 2018) ................................................. 16, 22

*Williams v. Gen. Motors Corp.*,
    187 F.3d 553 (6th Cir. 1999) ................................................. 11, 12

*Zetwick v. Cnty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017) ................................................. 3, 13

**Statutes and Rules**

Cal. Gov't Code § 12923(b) ................................................................. 10
Cal. Gov't Code § 12923(c) .................................................................. 4
29 U.S.C. § 791(b) ................................................................. 22

v

## <u>INTRODUCTION</u>

Appellees' brief is wide of the mark on both Dr. Mattioda's harassment claim (dismissed under Rule 12(b)(6)) and his discrimination claim (dismissed on summary judgment).

As to his harassment claim, Appellees disregard the "totality of the circumstances" test, which is used to judge the sufficiency of a harassment claim. Instead, they parse out various allegations into different pieces, ignoring (sometimes expressly) the most crucial allegations linking the harassment to Dr. Mattioda's disability. Having pretended that these allegations simply do not exist, Appellees then attempt to minimize the remaining allegations it plucks out of the complaint. But this slicing and dicing, which was also done by the trial court, is by definition contrary to the "totality of the circumstances" test. Properly viewing this matter through that lens, it is clear that Dr. Mattioda has faced a pervasive pattern of harassment from two different supervisors, which includes mocking his disability, threatening him for requesting accommodations, and applying tired stereotypes of disabled people in their characterizations of him. By any measure, this conduct constitutes actionable harassment.

As for his discrimination claim based on Appellees' selection process for the Senior Technical Scientist position ("ST Position"), Appellees cannot escape some of the key facts highlighting the discriminatory process. Specifically, there is a

history of discriminatory conduct by Dr. Lee. Implicitly acknowledging this concern, Dr. Lee recused himself from the selection process, but simultaneously provided the panel with numerical ($h$-index) data ranking Dr. Sandford as the top candidate. In so ranking, this $h$-index data inherently produced discriminatory effects against Dr. Mattioda, as he was penalized in the scoring for his periods of disability leave. Notably, this data was not part of the written evaluation criteria for the position, and did not enter the evaluation process at all until Dr. Lee provided it. Further, it heavily influenced the panel, as it is cited heavily throughout the panel's written analysis of the candidates. There are clearly some significant questions of fact for the jury to decide in these circumstances, including but not limited to whether there was discrimination in light of the anti-disability bias of the $h$-index score generally, and whether Dr. Lee had discriminatory intent in providing such data to the panel.

## LEGAL ARGUMENT

### a. Appellee's Brief Departs from the "Totality of the Circumstances" Test Used in Harassment Cases

Appellees' brief takes an ignore-and-minimize approach to Dr. Mattioda's harassment claim, which was dismissed under Rule 12(b)(6). They repeatedly ignore some of the most crucial facts supporting Dr. Mattioda's harassment claim – sometimes admittedly so – and they then attempt to minimize the remaining facts. Applying the required "totality of the circumstances" test, however, this approach

is improper.  Under this test, all of Dr. Mattioda's allegations must be accepted as true, and they must all be considered in order to analyze the "totality of the circumstances."

### i. In Arguing the Lack of a Nexus Between Dr. Mattioda's Disability and the Harassment, Appellees Ignore the Actual Nexus.

To start, Appellees stick their head in the sand, and simply claim that Dr. Mattioda's harassment allegations are conclusory.  But this analysis ignores much of the operative complaint and opening brief, both of which lay out in great detail the nexus between his disability and the harassment he received.

First, all parties can apparently agree that the threats to Dr. Mattioda's job if he continued making reasonable accommodations request are harassing comments directly linked to his disability.  (*See* Appellees' Br., 20; 1-ER-042.)  Nevertheless, Appellees assert the trial court was correct in disregarding this comment simply because it relates to Dr. Mattioda's reasonable accommodation request. In disregarding this comment, the trial judge essentially applied an exclusionary rule to this evidence that does not exist for harassment cases.  To prove harassment, the trier of fact must apply the "totality of the circumstances" test.  *See Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 444 (9th Cir. 2017) (context is crucial for a harassment claim, where the claim is viewed based on the "totality of the circumstances" and the "cumulative effect of the conduct at issue."); *see also* Cal.

3

Gov't Code § 12923(c) (codifying that standard under California state law). The decision below, which expressly refused to consider this specific fact, by definition did not take into account the "totality of the circumstances," which is itself reversible error.

Defendants clearly created a hostile work environment for Dr. Mattioda when his superiors ridiculed him for requesting accommodations and viewed him as damaged because of his disability. First, the harassing comments did not even start until Dr. Mattioda revealed his disability to his supervisors and requested reasonable accommodations. (*See* 3-ER-382.)

Second, beyond that trigger point, Dr. Mattioda endured many comments directly related to his disability, to which Appellees do not even respond in their brief. For example:

- Dr. Lee ridiculed Dr. Mattioda's accommodations requests in front of others, saying, "I don't know why you can't just tough it out or suck it up…" (Appellant's Br., at 29 (citing 3-ER-382).) This comment is pure harassment because (a) it revealed Dr. Mattioda' disability to coworkers; and (b) disabled employees cannot simply "tough" out their physical limitations. Yet, Appellees do not address this obviously belittling and harassing comment.

- Dr. Lee's subordinate, Dr. Dotson further mocked him for not having a "magic pot of $" to fund his accommodations request for an economic chair, even though she provided ergonomic chairs to non-disabled employees. (*Id*. (citing 3-ER-386-387).) Appellees do not address this comment, which directly refers to his disability accommodations requests.

- When Dr. Mattioda's disabilities prevented him from attending a conference in-person (but he was willing to appear virtually), Dr. Dotson questioned his "commitment to being a high-profile scientist." (*Id*., at 30 (3-ER-392).) Notably, this comment accompanied a negative performance review, which formed the basis of a discrimination claim surviving summary judgment. Yet, Appellees do not address this harassing comment triggered by Dr. Mattioda's physical limitations.

To be sure, these comments are all directly related to Dr. Mattioda's disability, as they harass him simply for needing accommodations. The harassing nature of these comments becomes even more clear, however, once one considers the overall animosity Dr. Mattioda has received for making these requests, as illustrated by the threat to his job (which the trial court expressly chose not to consider).

Moreover, these harassing comments are not the only ones Dr. Mattioda has endured at NASA. As Appellees' recognize, Dr. Mattioda alleges numerous comments by Dr. Lee about his perceived productivity and/or laziness. (Appellees' Br., at 18-19.) These comments include:

- Dr. Lee accusing Dr. Mattioda of having another researcher "doing all the work for [him]," (3-ER-384;)

- A colleague having to take pictures of Dr. Mattioda to prove to Dr. Lee that he actually does perform his work, (3-ER-387;)

- Dr. Lee mocked Dr. Mattioda's ability to earn a promotion – a promotion he did, in fact, receive, (3-ER-389;)

- Dr. Lee yelled at Dr. Mattioda in front of others when Dr. Mattioda had the audacity to suggest he had the ability to manage and oversee another researcher, (3-ER-403-404;) and

- During a conference dinner, Dr. Lee commented to Dr. Mattioda's colleagues, "Good luck getting him to do anything," (3-ER-395-396.)

(Appellant's Br., 31-32; *see also* Appellees' Br., at 18-19.)

As laid out extensively in Appellant's briefing, these comments can easily be traced to unfortunate, but well-entrenched stereotypes that disabled people are not as productive, or even outright lazy. (*See* Appellant's Br., 30-33 (citing, e.g., *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1108 (S.D. Ga. 1995)). The

connection between these comments and Dr. Mattioda's disability is all the more apparent when one considers (a) how baseless they are for such a highly accomplished scientist who earns promotions at NASA; and (b) a fellow researcher witnessed Dr. Lee linking this mistaken and prejudiced perception to his belief that Dr. Mattioda was using his medical and disability issues to avoid work. A perceived laziness that has no basis in fact, and only has basis in stereotyping, should be more than sufficient to establish a link between these comments and Dr. Mattioda's disability. Taking these comments in context together as the Court must do, it is clear defendants created a hostile work environment that altered his work environment.

In response, Appellees attempt in vain to isolate and separate these comments rather than view them through the required lens of the "totality of the circumstances" test. Remarkably, Appellees then argue the comments are unrelated to disability because their separation of these comments ignores the crucial links between these comments and disability harassment.

Viewing these comments as a whole, as *Zetwick* instructs us to do, they create a hostile and harassing workplace. They created an environment that was hostile to Dr. Mattioda's physical limitations and that fostered stereotyping of his abilities. The court below erred by slicing and dicing such comments without viewing them in this broader context.

7

### ii. The Harassing Conduct was Both Severe and Pervasive.

Appellees further attempt to downplay the above treatment as part of the "ordinary tribulations of the workplace." (Appellees' Br., at 22.) Needless to say, threatening an employee with termination because he is disabled and requesting an accommodation does not constitute "ordinary tribulations of the workplace" by any definition. These comments were well beyond ordinary and, when taken as a whole, were so pervasive to create a hostile work environment, especially at the pleading stage.

It has long been recognized that hostile comments from a supervisor, as opposed to a co-worker, become more severe because they carry the weight of supervisory authority. *See e.g.*, *Dee v. Vintage Petroleum, Inc.*, 106 Cal. App. 4th 30 (2003) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 927 n. 9 (9th Cir.2000); *Rodgers v. Western–Southern Life Insurance*, 12 F.3d 668, 675 (7th Cir. 1993)). In *Dee*, a supervisor's single remark that "it is your Filipino understanding against mine," was more than sufficient to link the supervisor's other, more general berating comments to ethnic animus. *Id.*, at 36-37.

Here, the comments derive from two different supervisors – and the harassing conduct is far from trivial. First, there are few comments more severe than a supervisor threatening someone's job simply because they need physical accommodations. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993)

(taking into account the severity and threatening nature of comments). Moreover, his need for physical accommodations caused Dr. Mattioda's dedication to his job to be questioned (while being discriminatorily downgraded on a performance review), and a supervisor mocked him in front of others for not being able to "tough [] out" his disability. *See id* (humiliating conduct can constitute harassment). For a disabled person who has physical limitations, these threatening and mocking comments from a supervisor are quite severe.

The comments about Dr. Mattioda's perceived laziness are also sufficiently actionable as humiliating conduct. *See id*. Here, as described above, Dr. Lee made frequent comments and jokes to Dr. Mattioda about his perceived laziness and lack of abilities. Clearly, such comments based on stereotype have no basis in reality for someone of Dr. Mattioda's abilities, but they all serve to undermine his competency and his ability to do his job. Making these comments even more egregious is that they were not limited to hostile joking to Dr. Mattioda himself, but openly to his colleagues – to the point that coworkers had to take pictures of him doing work to prove to Dr. Lee just how incorrect his perceptions are.

This conduct is also quite pervasive. It is not one or two utterances that are at issue, but a constant stream of harassing comments, including job threats, from two different supervisors over several years. By any measure of pervasiveness, that is sufficient.

9

Moreover, there is no doubt this harassment has altered the conditions of Dr. Mattioda's working environment. *See Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir.1991) (hostile work environment claim when "the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment"); *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001).[1]  Dr. Lee's belittling of Dr. Mattioda's disabilities in front of others was "embarrassing," (3-ER-382,) and Dr. Mattioda even asked to change divisions to escape Dr. Lee's mistreatment.  (3-ER-383.) At various times, Dr. Mattioda felt "isolated" and "singled out."  (3-ER-385.)  Dr. Mattioda later acknowledged in his deposition that, when he arrived at work, he would sit in his car, hang his head and cry as he did not want to have to endure the work environment Drs. Lee and Dotson created for him.  (*See* SER-083.)[2]

Although Appellees wish to downplay the severity of this conduct as simply "NASA management exercising their normal supervisory authority," (Appellees' Br., at 22,) the fact is that this conduct has "pollute[d] the victim's workplace,

---

[1] California state law codifies a similar standard, and expressly establishes that a "single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." (Cal. Gov't Code § 12923(b).)

[2] Although this fact came out in subsequent deposition testimony, Appellant cites to it to illustrate how the record would have continued to develop had this harassment claim been permitted to proceed.

10

making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay in [his] position." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017) (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)).

### iii. Appellees Adopt the Trial Court's Incorrect Pleading Standard.

Despite the above, Appellees continue insist that "Dr. Mattioda's allegations of harassment [] contained only conclusions of discriminatory intent." (Appellees' Br., at 23.) In that analysis, Appellees seem to believe that each specific comment must overtly relate to Dr. Mattioda's disability in order to be actionable. But harassment jurisprudence does not go so far – and Appellees do not cite a single case supporting such an unworkable standard.

For example, both *Flowers* and *Ray* illustrate examples where harassment existed, even though each individual act may not have overtly been connected to the protected basis. (*See* Appellant's Br., at 28 (citing *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000); *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 236-237 (5th Cir. 2001)).) And there are plenty of other cases like *Ray* and *Flowers*, because the general idea of harassment is that, "[a]ny unequal treatment of an employee that would not occur but for the employee's [protected status] may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment…" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565–66 (6th Cir.

11

1999); *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) (in sexual harassment cases, "the offensive conduct is not necessarily required to include sexual overtones in every instance."). In *Williams*, a female employee experienced harassing conduct, not all of which was explicitly sexual or based on sex. In finding that the harassment could still be based on sex, the Court highlighted the below example that was far from overt:

> For example, about the admittedly non-sexual box throwing incident with Giovannoe, Williams stated: "Even when Gio[vannoe] threw the box at me, nobody comes, they don't want to talk to me. So I begin to feel like I didn't have anybody there." As this statement so clearly illustrates, non-sexual abuse can undermine competency as much as explicitly *sexual* harassing behavior.

*Id.*, at 566 n. 5.

Given this general approach to harassment claims, Appellees' attempt to distinguish *Flowers* and *Ray* is beside the point. According to Appellees, *Flowers* should be inapplicable because of "the special deference to the jury" that is afforded to its evidentiary findings. (Appellees' Br., at 24.) But, at the motion to dismiss stage here, there is a similar deference, as factual allegations are always presumed to be true and "construed in the light most favorable to the nonmoving party." *See Douglas v. Noelle*, 567 F.3d 1103, 1106 (9th Cir. 2009). Thus, any special deference a jury is given as to facts does not distinguish *Flowers* from the instant matter.

12

Appellees also paint *Flowers* as facing "harassment [that] was far more severe than that alleged by Dr. Mattioda," as "she was subject to write ups, placements on probation, and eventual discharge." (Appellees' Br., at 24.) But this argument only again highlights Appellees' misunderstanding of the facts in this case, as Dr. Mattioda expressly alleged that, among other things, he was also subject to a lower performance evaluation and was directly threatened with termination – facts that Appellees either ignore, or insist should be ignored. Nor are such adverse actions even necessary to support a harassment claim in any event. *See Zetwick*, 850 F.3d at 444; *Flowers*, 247 F.3d at 235-36.

As for *Ray*, Appellees concede that some of the conduct faced by that plaintiff is similar to the conduct faced by Dr. Mattioda. (Appellees' Br., at 24 (characterizing it as "the more minor issues").) But Appellees nevertheless try to distinguish the case on the basis that the *Ray* supervisor "made physically threatening gestures causing him to flee from a meeting." (*Id*.) But threats of physical violence, while certainly indicative of a hostile environment, are not the only way to establish harassment. *See Harris*, 510 U.S. at 22. And here, while they were not physical threats, there were threats to Dr. Mattioda's continued employment on account of his physical limitations – a fact Appellees wish to downplay.

Finally, Appellees rely too heavily on the *Iqbal*/*Twombly* pleading standard here. As presented in the opening brief, and not disputed by Appellees, the operative pleading standard for such a claim continues to be the one under *Swierkiewicz v. Sorema N. A*., 534 U.S. 506, 514–15 (2002). Under that standard, trial courts cannot require plaintiffs to plead "facts constituting either direct or circumstantial evidence of discrimination." *Maduka v. Sunrise Hosp*., 375 F.3d 909, 912–13 (9th Cir. 2004). To be clear, the above facts show how Dr. Mattioda's harassment claim is not just conclusory, but in fact quite plausible. In light of the still-valid *Swierkiewicz* standard, however, it becomes abundantly clear that Dr. Mattioda has adequately pleaded a claim for harassment.

Because the entire context of the factual allegations – including those matters ignored by the trial court and those matters expressly disregarded – the trial court erred in dismissing Dr. Mattioda's claims on a Rule 12(b)(6) motion.

### b. Contrary to Appellee's Arguments, the Jury Should Decide Whether Dr. Mattioda was Subjected to Discrimination in the Selection of the ST Position.

The trial court also erred in granting summary judgment to Appellees on the claim of discrimination in the selection process for the Senior Technical Scientist position ("ST Position"). Appellant provided sufficient evidence that Dr. Lee was biased against Dr. Mattioda, and that, as he recused himself from the selection panel, he provided data to the panel which (a) was discriminatory in its effects; (b)

was not originally part of the written evaluation criteria; (c) ranks Dr. Mattioda as the lowest candidate; and (d) was cited by panel members in their decision-making process. A jury could easily find discrimination in that process.

### i. Appellees Misconstrue the Minimal Showing Required for Dr. Mattioda to Meet his Prima Facie Showing

In being denied the ST Position, Dr. Mattioda met the minimal showing required to make a prima facie case of discrimination. Not only was the *h*-index value itself discriminatory in its effects, but the data was provided to the committee from the biased Dr. Lee, while he was recusing himself.

Appellee's first line of argument on the ST position goes to the competitive nature of the position. In their view, a prima facie case does not exist because "it [was] more likely than not that any given candidate would not be selected." (Appellees' Br, at 27.) But that is true for every open position, and Appellees cite no case for their theory that the size of the candidate pool is part of the prima facie analysis. In fact, it does not enter the analysis at all.

Instead, the crucial point of analysis is whether the plaintiff himself suffered discrimination because of his disability. As described in Appellant's opening brief, meeting this initial step of the *McDonnell Douglas* framework is a low burden. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1091 (9th Cir. 2001); *see also Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) ("[t]he requisite degree of proof necessary to establish a prima facie

case for [discrimination] ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.").

This "minimal" initial burden can be met through indirect or circumstantial evidence. *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1559 (9th Cir. 1994), as amended (Nov. 21, 1994), as amended (Dec. 14, 1994). For example, this minimal burden is easily met through other biased comments made by a decisionmaker, *see e.g.*, *Viana v. FedEx Corp. Servs., Inc.*, 728 F. App'x 642, 644 (9th Cir. 2018), or by a person who influenced a decisionmaker, *see France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015) (describing cat's paw theory). To meet this standard under a cat's paw theory, then the plaintiff must simply show that "the biased subordinate influenced or was involved in the decision or decisionmaking process." *Id.*; *see also Shager v. Upjohn Co.*, 913 F.2d 398, 404-405 (7th Cir. 1990) (cat's paw liability appropriate when the selection process is "tainted" by a biased person). Notably, these standards are far different than the price-fixing standard relied upon by Appellees, which is irrelevant to a discrimination case using the *McDonnell Douglas* analysis. (*See* Appellees' Br., at 28 (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990)).)

Here, there was a plethora of comments from Dr. Lee illustrating his bias against Dr. Mattioda. Contrary to Appellees' assertions, this evidence was introduced in admissible form at the summary judgment stage. (*See* Appellees' Br., at 30-31.) Notably, Dr. Lee began this hostile treatment of Dr. Mattioda when his disability prevented him from traveling to the Netherlands. At that point, Dr. Lee mocked Dr. Mattioda for not being able to "tough it out" when it came to his physical limitations. (2-ER-244.) Later, Dr. Lee began accusing Dr. Mattioda of having someone else do his work for him, applying the stereotypical thinking described above in great detail. (*See e.g.*, 2-ER-245.) By February 2016, Dr. Lee stopped collaborating with Dr. Mattioda, and excluded him from various projects. (2-ER-251.) This treatment continued through 2017, when Dr. Lee shouted at Dr. Mattioda in front of others, and ridiculed his capacity to manage another employee. (2-ER-256.) Further, it was Dr. Lee's subordinate, Dr. Dotson, who previously threatened Dr. Mattioda's job if he continued to make reasonable accommodations requests. (2-ER-246.) None of these statements is subject to the hearsay or speculation objections, which form the sole basis for Appellees' opposition here. (Appellees' Br., at 31.)

Importantly, Dr. Lee himself recognized the potential bias against Dr. Mattioda because he recused himself from the selection panel. Notably, however, as he "recused" himself, he nonetheless influenced the decision-making process by

17

providing the panel with his own $h$-index calculations, which happened to rank Dr. Mattioda as the lowest candidate because of his periods of disability leave. A factfinder could easily find that entire process suspicious, where a decisionmaker ostensibly recuses himself, while contemporaneously providing "objective" data purporting to rank last the very candidate who caused the recusal.

That process is made all the more suspect considering that $h$-index values were not even part of the written evaluation criteria for the position. Instead, the evaluation criteria apparently stressed the opposite principal: "[u]ndue emphasis should not be accorded to the mere number of publications," and that "the quality and scientific/technical significance, and especially the number of quality contributions, are more important." (2-ER-84.) But $h$-index values emphasize quantity of work over time, and thus take the selection process in a different direction than the written guidelines. As deposition testimony revealed, if the selection panel wished to add or change any qualification criteria to the position, it would need to be added to the job vacancy. (*See* SER-011.)

It is hardly surprising that the $h$-index values ranked Dr. Mattioda lower. As discussed in Appellant's opening brief, these values penalize him for periods of time that he could not work due to his physical disabilities. (Appellant's Br, at 19.) Thus, even if the index is "facially neutral," as Appellees suggest, (*see* Appellees' Br., at 29,) its values result in an inherently biased score. Contrary to Appellees'

18

characterization, this bias is not a matter of Dr. Mattioda mere personal "preference," but the fact is that this inherently biased score was not part of the evaluation criteria until the recused Dr. Lee provided it to the panel. Given Dr. Lee's clear animus towards Dr. Mattioda, a trial court could not say as a matter of law that Dr. Lee's offering of the data was not an attempt to scuttle Dr. Mattioda's selection.

Dr. Lee's involvement as he recused himself also clearly tainted the panel, especially when viewing the evidence in a light most favorable to the plaintiff. After all, each panelist referenced either the *h*-index numbers themselves, or some of the index's underlying data as a key part of their rankings. (*See* 2-ER-231 (noting "207 papers in peer reviewed journals"), 232 (referencing the underlying *h*-index values, and also noting that category, EC2 was the most heavily weighted); and 234 (citing Dr. Mattioda's "H index of 16").) Even in some of the after-the-fact materials cited in Appellees' brief, the decision makers still remained swayed by the data. (*See e.g*., 2-ER-287-288 (Dr. Zornetzer noting the "citation index" as part of the evaluation criteria, and then subsequently adding that Dr. Sandford "had the most impact of all the candidates based on the index scores."); 2-ER-279 (Dr. Tu describing his final decision being based on the fact that "Dr. Sandford had an outstanding publication record, and his citations index spoke to the impact he had on the scientific community.").)

Whether there were "alternative citation indices" that would have portrayed Dr. Mattioda in a better light, as urged by Appellees, is a red herring because the *h*-index values used was flawed.  (*See* Appellees' Br., at 29.)  Not only was the written criteria silent about the use of *any* indexed values, but Dr. Lee's provision of this data to the panel upon his recusal was the culmination of years of discriminatory treatment.  And the question of whether Dr. Lee intended to discriminate further against Dr. Mattioda by inserting this data into the process from which he recused himself is a question for the jury.  *See Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 32 (1st Cir. 1990) ("Intent to discriminate is a question of fact and we must leave this determination to the jury.") (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 287–88 (1982).)

Appellees attempt to escape this cat's paw by mischaracterizing the unpublished Sixth Circuit case of *Davis v. Omni-Care*, arguing that, as long as the "information provided to the supervisor was not inconsistent with actual events," the cat's paw theory is inapplicable.  (Appellees' Br., at 32 (citing 482 F. App'x 102, 109-110 (6th Cir. 2012).)  But *Davis* does not actually reach such a holding, and instead concludes that the cat's paw theory is inapplicable when an adverse action was caused completely independently of the tainted information.  *Id*.

Here, by contrast, the written evaluations of the job candidates specifically reference *h*-index values and the data underlying those values.  Even if Dr. Lee did

not expressly state a recommendation, he effectively made such a recommendation by numerical scores for each candidate. Again, considering that this data was not part of the selection criteria before Dr. Lee provided it to the panel, he undoubtedly influenced the process.

### ii. Appellees do not Show a Legitimate Non-Discriminatory Reason for the Decision that Undoes the Tainted Process

There is no legitimate reason to use $h$-index values, which were not originally part of the selection process, and which create stilted results for disabled employees.

Although Appellees argue that "[t]he hiring process had numerous guardrails to ensure that the most qualified applicant was hired," such as written evaluation criteria, (Appellees' Br., at 33,) it is important to note, as described above, that Appellees departed from those guardrails.

First, not only did Dr. Lee influence the committee while being recused, but the data he provided departed from the written evaluation criteria touted by Appellees. Further, the panel, who was aware that Dr. Lee recused himself, actually used that data despite his recusal. Although the written criteria also emphasized quality over quantity, Appellees apparently concede that this publication data was a crucial part of distinguishing Dr. Mattioda from Dr. Sandford. (*See* Appellees' Br., at 34.) Moreover, the panel's reliance on $h$-index data, which necessarily penalizes an employee who has been out on disability

21

leave, opens the question about whether the federal government is fulfilling its heightened responsibilities under the Rehabilitation Act not just to prevent discrimination but to take "affirmative action" to "for the hiring, placement, and advancement of individuals with disabilities." 29 U.S.C. § 791(b).

Given the clear use of Dr. Lee's data in making its decision despite the written criteria, there is clearly an issue of fact regarding whether Appellees have shown that its use of the *h*-index values had a legitimate, non-discriminatory purpose.

### iii. There Also Remains a Genuine Issue of Material Fact as to Pretext

"Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). Here, much of the same evidence cited above regarding Dr. Mattioda's prima facie case of discrimination is also relevant to pretext. *See Viana*, 728 F. App'x at 644.

Appellees assert "Dr. Mattioda cannot show pretext as he was not the 'clearly superior' candidate." (Appellees' Br., at 36 (citing *Peters v. Shamrock Foods Co.*, 262 F. App'x 30, 33 (9th Cir. 2007)).) But Appellees are incorrect that such a showing is required. It is simply one way of establishing pretext. In fact, the *Peters* Court specifically held that "[q]ualifications evidence standing alone *may* establish pretext," and then proceeded to discuss various other ways pretext

could be established. *Id* (emphasis added). Here, the fact is that the *h*-index data is effectively biased against Dr. Mattioda's disability, and it was provided to the selection panel by a person who had a discriminatory animus against him. That is sufficient to establish pretext on its own.

Yet, other factors also point to pretext as well. For example, deviations from protocol and procedural irregularities can also support an inference of pretext. *See Porter v. California Dep't of Corr.*, 419 F.3d 885, 896 (9th Cir. 2005). Here, Appellees deviated from protocol by departing from the written selection criteria in the consideration of the *h*-index values. In fact, deposition testimony was clear that any additional qualification criteria were supposed to be added to the vacancy announcement. (SER-011.)

In the end, the *h*-index data itself was discriminatory, which naturally then creates discriminatory results. There is a significant question of fact as to Dr. Lee's intent when he provided that data to the panel. These questions of discrimination should all go to a jury.

## CONCLUSION

For the reasons stated above, Plaintiff/Appellant asks this court to reverse the decision of the district court, and permit him to pursue his claims for harassment, while permitting his discrimination claim based on the selection of the ST Position to go to trial.

Respectfully submitted,


 */s/ Erika Heath*
Erika A. Heath
DUCKWORTH & PETERS LLP
369 Pine Street, Suite 410
San Francisco, CA  94104
(415) 433-0333
erika@duckworthpeters.com

*Attorney for Plaintiff/Appellant
Andrew Mattioda*

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Ninth Circuit Local Rule 32-1(b) because this brief contains 5,287 words, excluding parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This filing complies with Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

3. This brief has been scanned for viruses pursuant to Rule 27(h)(2).

*/s/ Erika Heath*
Erika A. Heath
Attorney for Plaintiff/Appellant

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 10, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Erika Heath*
Erika A. Heath
Attorney for Plaintiff/Appellant